CITY OF KANSAS CITY,
Missouri, Appellant,

v.

Joseph ARTHUR, and Division
of Employment Security,
Respondents.

No. WD 56537.

Missouri Court of Appeals,
Western District.

Submitted May 18, 1999.

Decided Aug. 31, 1999.

Margaret S. Moran, Government Counsel, Kansas City, for Appellant.

John F. Wilcox, Sharon A. Willis, Kansas City, for Respondent Arthur.

Before HOWARD, P.J.; ULRICH and SMART, JJ.

PER CURIAM.

The city of Kansas City, Missouri, ("City") terminated Joseph Arthur's employment because it found that he did not comply with the express requirement of the City Charter that employees reside within the boundaries of the City. The Labor and Industrial Relations Commission ("Commission") reversed an appeals tribunal decision which held that Arthur was disqualified from receiving unemployment benefits. The Commission found that the City did not meet its burden of proving that Arthur's employment was ter-minated because of misconduct associated with his employment. The City appeals.

The judgment of the Commission is reversed.

## Background

**Kansas City, Mo., Code of Ordinances, § 2–972 (1994) requires:**

(4) Residence and domicile as used in this section shall mean principal place of residence and domicile within the city limits.

(5) Any employee who has established a residence and domicile within the city limits and who subsequently moves his place of residence and domicile outside the city limits shall automatically forfeit his position of employment with the city.

(6) Nonelected employees of the city failing to comply with the provisions of this section will be dismissed from the municipal service forthwith and automatically removed from the payroll by the human resources director. . . .

In 1981, Joseph Arthur began working for the City as a carpenter. When Arthur began working for the City, he resided in Kansas City, Missouri. In 1989, Arthur purchased a house in Lee's Summit, Missouri. He and his family continued to reside in Kansas City, at his parents' house, while the Arthurs' new house was being remodeled. In 1991, Arthur's wife and son moved into the house in Lee's Summit. Arthur represented to the City that he continued to stay at his parents' house, but that he often visited his family in Lee's Summit.

In 1993, the City investigated Arthur's residency. Arthur persuaded the City that he really resided in Kansas City although his family resided in Lee's Summit, by representing that he was in the process of a divorce. In 1997, the City investigated Arthur's residency again. The private investigator determined that Arthur spent ninety percent of his time at his Lee's Summit address.

The City held a predetermination hearing recommending that Arthur's employment with the City be terminated. On January 22, 1998, Arthur was suspended without pay, and on February 18, 1998, he was fired for failing to comply with the City's residency requirement. Arthur subsequently filed for unemployment benefits. A deputy with the Division of Employment Security found that Arthur was not entitled to benefits, noting that Arthur "was discharged because he violated his employer's residency policy." Based on that finding, the deputy determined that Arthur was disqualified for six weeks because he was discharged by the City on February 12, 1998 for misconduct connected with work.

In modifying the deputy's determination, the appeals tribunal stated:

In the present case, the claimant became unemployed because he failed to prove to the satisfaction of the employer that he maintained a residence and domicile within the city limits of Kansas City, Missouri, as required by city ordinance. The city ordinance provides that, if an employee fails to maintain a residence and domicile within the city limits, he or she shall forfeit his or her job....

The claimant had both actual and constructive knowledge that his job would be forfeited if he did not maintain a residence and domicile in Kansas City, Missouri. By voluntarily moving from Kansas City, Missouri to Lee's Summit, Missouri, the claimant forfeited his job. It is concluded that the claimant voluntarily left his work on January 22, 1998. His leaving work was not for any good cause attributable to his work or to his employer. It is concluded that the claimant voluntarily left work on January 22, 1998, without good cause attributable to his work or to his employer.

Arthur appealed the appeals tribunal's decision to the Commission. On appeal, the Commission addressed the following issues: (1) whether the appeals tribunal was correct that Arthur voluntarily left his employment as opposed to being terminated; and (2) if Arthur voluntarily left his employment, whether it was for good cause attributable to the City; and (3) if Arthur's employment was terminated, whether it was for misconduct connected with his work.

The Commission found that the City terminated Arthur's employment, disagreeing with the appeals tribunal, which concluded that Arthur voluntarily left his employment. The Commission then looked at the issue of misconduct. Although the Commission found that Arthur knowingly violated the City's residence requirement and determined that the City's termination of his employment was justified, the Commission did not believe that Arthur's violation of the City's residency requirement constituted misconduct connected with his work. The Commission found that "the rule in question [did] not concern job performance but suitability for employment.... Claimant was not terminated for any wanton or wilful act connected with the performance of his work." The Commission reversed the appeals tribunal's decision and concluded that Arthur was not disqualified from receiving unemployment benefits.

The City appeals, claiming that the Commission erred in reversing the decision of the appeals tribunal. The City claims that the Commission erred in holding that Arthur's knowing violation of the City's residency requirement was not misconduct connected with his work and that he was not disqualified from receiving benefits. The City does not challenge the Commission's determination that the City terminated Arthur.

## Standard of Review

■ Our review of the Commission's decision is governed by Article 5, § 18 of the Missouri Constitution, which gives to the court the power to review administrative decisions to determine whether such deci-

sions are authorized by law. *See also* § 288.210, RSMo. Supp.1998. Our jurisdiction is limited to questions of law. *Id.*

 This court is not bound by the Commission's conclusions of law or the Commission's application of law to the facts. *Division of Employment Sec. v. Taney County Dist. R–III,* 922 S.W.2d 391, 393 (Mo. banc 1996). Where the Commission's decision involves a question of law, we review the issue independently. *George–Brewer v. Pen Mar Southwest,* 980 S.W.2d 147, 149 (Mo.App.1998). Whether an employee's actions constitute misconduct associated with his work is a question of law. *Sain v. Labor & Indus. Rel. Comm'n,* 564 S.W.2d 59, 61 (Mo.App.1978). As such, we are not bound by the Commission's determination on this issue.

 Section 288.020, RSMo 1994, directs that unemployment security law be liberally construed so as to further the public policy of Missouri in setting aside unemployment reserves to benefit persons unemployed through no fault of their own. *Sokol v. Labor & Indus. Rel. Comm'n,* 946 S.W.2d 20, 23 (Mo.App.1997). In keeping with this policy, disqualifying provisions in the law are strictly construed against the disallowance of benefits. *Missouri Div. of Employment Sec. v. Labor & Indus. Rel. Comm'n,* 651 S.W.2d 145, 148 (Mo. banc 1983).

### Misconduct

In the present case, the Commission found that although Arthur's employment with the City was terminated for violating the residency requirement, the violation did not constitute misconduct. Therefore, the only issue before us is one of first impression: whether Arthur's violation of the City's residency requirement constituted misconduct related to his employment with the City.

Section 288.050.2 allows for the disqualification of a claimant where there is misconduct connected with the claimant's work. That section provides:

Notwithstanding the other provisions of this law, if a deputy finds that a claimant has been discharged for misconduct connected with the claimant's work, such claimant, depending upon the seriousness of the misconduct as determined by the deputy according to the circumstances in each case, shall be disqualified for waiting week credit or benefits for not less than four nor more than sixteen weeks for which the claimant claims benefits and is otherwise eligible. In addition to the disqualification for benefits pursuant to this provision the division may in the more aggravated cases of misconduct, cancel all or any part of the individual's wage credits, which were established through the individual's employment by the employer who discharged such individual, according to the seriousness of the misconduct. A disqualification provided for pursuant to this subsection shall not apply to any week which occurs after the claimant has earned wages for work insured pursuant to the unemployment compensation laws of any state in an amount equal to eight times the claimant's weekly benefit amount.

§ 288.050.2, RSMo Supp.1998. The employment security statutes do not define misconduct. However, the term has been defined by Missouri courts to mean:

an act of wanton or wilful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer.

*Sain,* 564 S.W.2d at 62 (quoting 76 Am. Jur.2d *Unemployment Compensation* § 52).

Generally, the claimant has the burden of proving eligibility for benefits. *Hessler v. Labor & Indus. Rel. Comm'n*, 851 S.W.2d 516, 518 (Mo. banc 1993). However, because the City claims that Arthur was discharged for misconduct, the burden shifts to the City. *Kansas City Club v. Labor & Indus. Rel. Comm'n*, 840 S.W.2d 273, 275 (Mo.App.1992). "For an employee to be disqualified from benefits for misconduct connected with work, the employer must show that the employee violated a reasonable work rule." *Division of Employment Sec. v. Gardner–Denver Mach., Inc.*, 941 S.W.2d 13, 15 (Mo. App.1997).

In reviewing Arthur's case the Commission found, and we agree, that "[b]ecause [Arthur] did not remain a resident and domiciliary of Kansas City, [he] violated [the City's] rule regarding residence and domicile of employees." However, the Commission stated that "[Arthur's] knowing violation of [the City's] rule does not necessarily constitute misconduct connected with his work. The nature of the rule which [Arthur] violated, leading to his termination, must also be examined." The Commission then turned to *Laswell v. Industrial Comm'n*, 534 S.W.2d 613 (Mo. App.1976). *Laswell* involved the termination of an employee for violating his employer's "no beard" policy. The court in *Laswell* distinguished between rules related to job performance and rules related to suitability for employment. *Id.* at 617. In the present case, the Commission found that the City's residency requirement was tantamount to a rule of suitability of employment, and was not connected to Arthur's work for the City. The Commission concluded that Arthur had not engaged in misconduct connected with his work, and was entitled to receive unemployment benefits. We do not find *Laswell* persuasive, given the vastly different nature of the rules involved in each case.

Because this is an issue of first impression in Missouri, we have turned to other jurisdictions for guidance in addressing this issue. In reviewing the cases of other jurisdictions, we find the most persuasive authorities suggesting that knowing violation of a residence requirement amounts to misconduct connected with work. For instance, in *City of Saginaw v. Lindquist*, 427 Mich. 224, 398 N.W.2d 275 (1986), the Michigan Supreme Court held that a city employee who failed to maintain a permanent city residence was not entitled to unemployment benefits. In that case, Lindquist began working for the City of Saginaw in 1971, and was terminated in 1981 for failing to maintain a "permanent bona fide residence within the corporate limits of the City...." *Id.* at 278. In 1977, Lindquist and her husband sold their Saginaw home, and Lindquist's husband and children moved to Lupton, Michigan, while Lindquist represented that she resided with an aunt who lived in Saginaw. *Id* at 279. Lindquist traveled to Lupton each weekend to be with her family, as well as during the week to attend school or other family-related activities. *Id.*

After her termination, Lindquist filed a request for unemployment benefits, which was initially denied. Upon re-determination, the Michigan Employment Security Commission ruled that Lindquist did not commit wilful misconduct by failing to maintain a residence within the City limits because "[t]he rule regarding residency bears no relation to the work to be performed and therefore any violation of the rule cannot be considered misconduct in connection with work...." *Id.* at 279. The City appealed to an appeals referee, who found that although Lindquist voted in the City of Saginaw, listed a Saginaw address on her driver's license and received mail at a Saginaw address, Lindquist's house in Saginaw was not her "true home." *Id.* The Referee determined that Lindquist intended to reside in Lupton, Michigan, where her husband and children resided and that her Saginaw home was not her permanent home, but rather a place she stayed in an attempt to meet the City's residency requirements. *Id.* Based

upon these findings, the Board concluded that Lindquist engaged in misconduct connected with her work. *Id.*

Lindquist appealed to the Board of Review. The Board concluded that even if her violation of the City's residency requirement constituted misconduct, it was not misconduct associated with work because "the violation of the requirement did not occur on the job, nor did it occur because of problems in connection with work or work performance." *Id.* at 279–80. The circuit court agreed with the Board of Review and entered summary judgment in favor of Lindquist. *Id.* at 280. However, the court of appeals reversed the circuit court, finding that Lindquist violated the City's residency requirement and that such a violation constituted "an intentional and substantial disregard of [her] obligation to her employer which could be considered misconduct." *Id.*

The Michigan Supreme Court found that Lindquist's failure to comply with the City's residency requirement amounted to conduct showing a wilful disregard of her employer's interest." *Id.* at 282. The court determined that the City had "a strong interest in seeing that its rules are uniformly applied and followed" and "a right to expect that its employees would abide by the residency requirement." *Id.* The court ruled that Lindquist's misconduct was connected to her work:

> [Lindquist] had a duty and obligation to her employer to maintain her residency within the city limits. She was well-aware of this condition of her employment as evidenced by her attempt to sustain the appearance of residency in the city. That the employer chose to make this requirement a condition of continued employment tends to show the importance of the rule to the employer's interest.

*Id.*

In *Rodgers v. Unemployment Compensation Bd. of Review,* 40 Pa.Cmwlth. 552, 397 A.2d 1286 (1979), Catherine Rodgers resigned her position with the City of Phil-adelphia, in lieu of being discharged for violating the City's residency requirement. *Id.* at 1287. Rodgers maintained that her legal residence was a duplex in Philadelphia, where her bills were sent and for which she paid property taxes. *Id.* She stated that it was only when her son became ill that she temporarily moved out of the City to take care of him. *Id.* The Board found that "[w]hile the claimant was registered for voting purposes at her son's residence in Philadelphia, Pennsylvania, the municipal authorities determined that she spent a substantial portion of her time commuting from her permanent residence in Richboro, Pennsylvania." *Id.* Finding that Rodgers' conduct "amounted to a deliberate violation of the employer's rule and was certainly inimical to the employer's interests," the Commonwealth Court held that Rodgers' violation of the City's residency requirement constituted misconduct and affirmed the Board's denial of unemployment benefits. *Id.* at 1288. *See also City of Greensburg v. Unemployment Compensation Board of Review,* 139 Pa. Cmwlth. 265, 590 A.2d 388 (1991) (violation of municipal residency requirement amounted to misconduct where employee knew of rule and knew that employer intended strict enforcement).

Although there are other cases in other jurisdictions holding that violation of a residency requirement is not misconduct connected with work, we find those cases unpersuasive or factually distinguishable. For instance, *in Worthington Tractor Salvage, Inc. v. Miller,* 346 N.W.2d 168 (Minn.App.1984), the employer was not a municipality but was a private company. The employer maintained that the employee had been told that residing in the city of Worthington was a condition of employment, but the employee disputed this contention. *Id.* at 169. The employee contended that, after he was hired, the employer decided to order him to move to Worthington. It was clear only that at some point the employer decided that he wanted the employee, a private pilot, to

move to Worthington and that the employee refused. The employer had the burden of proof on the issue of misconduct. *Id.* at 171. The court found that the decision of the Commissioner of Economic Security in favor of the employee was not "without evidence to support it." *Id.* at 172. That case is distinguishable from the present case in that here it is clear that the employee understood that the location of his residence was a condition of employment. Moreover, in Worthington Tractor there was never any question about where the employee lived, and there was never any attempt to create a subterfuge about the location of the employee's residence. *Id.* at 170.

In this case, the City has consistently sought to enforce its residency requirement because of the strict wording of the City Charter, which provides for automatic forfeiture of employment upon residing outside the City. Moreover, Mr. Arthur strove for nine years to persuade the City as to his residence, knowing that the City would terminate him if he could no longer convince the City that he resided within the city limits. The employer has a right to expect basic honesty about an issue which the employee knows is important to the employer. *See Flanigan v. City of Kansas City,* 926 S.W.2d 98 (Mo.App. 1996).

■■■ In Missouri, an employee engages in misconduct if he commits "an act of wanton or wilful disregard of the employer's interest, [or] a deliberate violation of the employer's rules." *Sain,* 564 S.W.2d at 62 (quoting 76 Am.Jur.2d *Unemployment Compensation* § 52). Arthur wantonly and wilfully disregarded the City's interest, as well as deliberately violated the City's residency requirement.

Whether or not Mr. Arthur, or this court, thinks that the City's residency requirement is a reasonable or a good idea,

the City had evidently placed substantial value on compliance with the residency requirement. The City has an interest in uniformly applying its rules, and a right to expect that all of its employees, including Arthur, would abide by its residency requirement. The City may choose to believe that its citizens are served best by others who reside within the City's boundaries and are subject to the same conditions. The fact that the City made residency a requirement for continued employment shows that the City valued the residency requirement. Arthur was well aware of his duty, as evidenced by the lengths he pursued to persuade the City that he resided within the city limits, when in fact, it appears that he resided with his family in Lee's Summit.

For all the foregoing reasons, we hold that the Commission erred in its determination that Arthur was not guilty of work-related misconduct.

### Conclusion

The City did not appeal the issue of whether the Commission erred in determining that the City terminated Arthur. Consequently, we need not address the issue of whether Arthur voluntarily left work without good cause attributable to his work or his employer.[1] The sole issue before us on this appeal is the issue of whether the claimant was guilty of misconduct connected with his work within the meaning of § 288.050.2, RSMo 1994. For the reasons discussed above, we conclude that Arthur's decision to reside outside the City limits does amount to misconduct connected with his work. The decision of the Commission is reversed.

---

1. If the appeals tribunal was correct in ruling that Arthur left his work voluntarily for reasons unrelated to his work, Arthur would be ineligible for any benefits rather than disqualified for only six weeks; the City, however, has argued only the issue of misconduct on this appeal.